UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

DANIEL GOLDSTEIN, *et al.*,

                      Plaintiffs,

     -against-

GEORGE E. PATAKI, *et al.*,

                     Defendants.
-------------------------------------------------------------X

AARON PILLER, *et al.*,

                      Plaintiffs,

     -against-

GEORGE E. PATAKI, *et al.*,

                     Defendants.
-------------------------------------------------------------X

**MEMORANDUM & ORDER**

06-CV-5827 (NGG) (RML)

07-CV-152 (NGG) (RML)

NICHOLAS G. GARAUFIS, District Judge.

     Before the court are all parties' objections to the recommendation of The Honorable

Robert M. Levy, United Stated Magistrate Judge, that the court dismiss this consolidated case.

For the reasons set forth in this Memorandum and Order, this court accepts and adopts those

recommendations in part, rejects those recommendations in part, and dismisses this consolidated

case in its entirety.

**I.     Factual Background**

     Because Defendants move to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6),

the court must accept all factual allegations in Plaintiffs pleadings and must draw inferences from

1

those allegations in the light most favorable to the Plaintiffs.  U.S. v. The Baylor Univ. Med. Ctr., 469 F.3d 263, 267 (2d Cir. 2006) (Rule 12(b)(6)); McGinty v. State, 193 F.3d 64, 68 (2d Cir. 1999) (Rule 12(b)(1)).

### A.    The Parties

#### 1.    Plaintiffs

Each Plaintiff owns or rents real estate in Brooklyn, New York located on land intended for use in the Atlantic Yards Arena and Development Project, which is described below.

#### 2.    The State Defendants

Defendant New York State Urban Development Corporation d/b/a Empire State Development Corporation ("ESDC") is an agency of New York State that was, at all relevant times, controlled by Defendant George E. Pataki, the Governor of New York State from 1995 until December 2006, and Defendant Charles A. Gargano, the Chief Executive Officer of the ESDC during that period.  These Defendants are collectively referred to as the "State Defendants."

#### 3.    The FCRC Defendants

Defendant Forest City Ratner Companies ("FCRC") is a New York corporation with a principal place of business in New York.  Defendant Bruce C. Ratner is the President and Chief Executive Officer of FCRC.  Defendant James P. Stuckey is an Executive Vice President of FCRC and the President of FCRC's Atlantic Yards Development Group.  Defendant Forest City Enterprises ("FCE") is a Delaware corporation with a principal place of business in Ohio. Defendant Ratner Group, Inc. is a New York corporation with a principal place of business in New York.  Defendants BR FCRC, LLC; Brooklyn Arena, LLC; Atlantic Yards Development

Co. LLC; BR Land, LLC; and FCR Land, LLC are New York limited-liability companies with principal places of business in New York. These Defendants are collectively referred to as the "FCRC Defendants."

### 4. The City Defendants

Defendant Michael Bloomberg has been the Mayor of Defendant New York City from 2002 to the present. Defendant Daniel L. Doctoroff has been a Deputy Mayor of New York City from 2002 to the present. Defendant New York City Economic Development Corporation ("EDC") is a New York non-profit corporation with a principal place of business in New York. Defendant Andrew M. Alper was President of the EDC for a portion of the period in which Plaintiffs' claims arose. Defendant Joshua Sirefman was Acting President of the EDC for a portion of the period in which Plaintiffs' claims arose. These Defendants are collectively referred to as the "City Defendants."

### B. The Atlantic Yards Arena and Development Project

FCRC intends to build the Atlantic Yards Arena and Development Project (the "Project") on twenty-two acres of land in Brooklyn, New York bounded generally on the north by Atlantic Avenue, the south by Dean Street, the east by Vanderbilt Avenue, and the west by Fourth Avenue (the "Project Area"). The Project is planned to consist of sixteen towers and 8.6 million square feet of floor space, including a sports arena, 6,860 housing units, approximately 600,000 square feet of office space, and a hotel. The Project Area encompasses both land containing property owned and rented by Plaintiffs (the "Takings Area") and land in which Plaintiffs have no interest, which consists primarily of the Vanderbilt Rail Yard site owned by the Metropolitan Transit Authority ("MTA") (the "Non-Takings Area"). The Vanderbilt Rail Yard is part of the Atlantic

Terminal Urban Renewal Area ("ATURA"), which New York City has designated as blighted ten times, first in 1968 and most recently in 2004. In all, approximately sixty-three percent of the Project Area is blighted.

FCRC conceived of the Project in or before the summer of 2002 and announced it publicly on December 11, 2003. In the interim, it purchased the New Jersey Nets basketball franchise, which it intends to move into the sports arena that is part of the Project, and solicited and received the support of Governor Pataki, Mayor Bloomberg, and Deputy Mayor Doctoroff. In December 2003, Mayor Bloomberg announced that FCRC would develop the Project with the ESDC. On February 18, 2005, Defendants memorialized their plans for the Project in two memoranda of understanding.

Prior to September 2003, the MTA stated more than once that it had sold to FCRC the right to develop the Vanderbilt Rail Yard. In September 2003, the MTA retracted those statements. On February 24, 2005, the MTA entered an agreement with FCRC indicating that the MTA had not sold to FCRC the right to develop the Vanderbilt Rail Yard. On May 25, 2005, the MTA issued a request for proposals ("RFP") to purchase the right to develop the Vanderbilt Rail Yard. The RFP provided that proposals must include twenty-year profit-and-loss projections. Only two entities submitted proposals. The first, FCRC, offered to pay $50 million and did not submit a twenty-year profit-and-loss projection. The second, the Extell Development Company ("Extell"), offered to pay $150 million and submitted the required profit-and-loss projection. Extell's proposal, unlike FCRC's, did not require the taking of any private property.

On July 27, 2005, the MTA granted FCRC the exclusive right to negotiate, during a forty-five-day period, for the right to develop the Vanderbilt Rail Yard. On September 14, 2005, the MTA announced that it would sell that development right to FCRC for $100 million.

### C. New York's Eminent Domain Procedure Law

Article Two of New York's Eminent Domain Procedure Law ("EDPL") sets forth procedures for determining the need for and location of public projects prior to the condemnation of private property. Defendants have availed themselves of those procedures, as described below. Article Four of the EDPL sets forth the procedures governing post-condemnation acquisition of private property for public projects. Defendants have not yet availed themselves of those procedures.

### 1. Article Two

New York law requires a condemnor[1] to conduct a pre-acquisition public hearing "in order to inform the public [of the proposed public project] and to review the public use to be served by a proposed public project." EDPL § 201. At the Section 201 hearing, the condemnor must announce the purpose and location of the proposed project, and those in attendance must be given an opportunity to present oral or written statements and to submit other documents concerning the project. EDPL § 203. The hearing must be conducted on the record, and the record must include a transcript of all oral statements made at the hearing and copies of all written statements and other documents submitted at the hearing. Id.; EDPL § 207(A) (indicating that the record includes "a written transcript" of the public hearing).

---

[1] A "condemnor" is "any entity vested with the power of eminent domain." EDPL § 103(D).

The ESDC issued a Notice of Public Hearing on July 24, 2006 and held a public hearing on August 23, 2006.  In addition, on September 12, 2006, the ESDC held a community forum to discuss the Project.

Within ninety days of a public hearing, a condemnor must publish a synopsis of its determination and findings.  EDPL § 204(A).  The synopsis must specify (1) the public use, benefit, or purpose to be served by the proposed public project; (2) the location of the project and the reason(s) that location was selected; (3) the general effect of the project on the environment and residents of the locality; and (4) other factors the condemnor considers relevant.  EDPL § 204(B).  The ESDC issued its determination and findings on December 8, 2006, indicating that ESDC should and would use its power of condemnation to acquire Plaintiffs' properties. (Determination and Findings (12/15/06 Kraus Decl. (Docket No. 51) Ex. E) (available at http://www.empire.state.ny.us/pdf/AtlanticYards/Determination%20and%20Findings.pdf (last visited June 5, 2007)).)  The ESDC identified the following as the public purposes to be served by the Project:

(1)     The elimination of blight in both the Takings and Non-Takings Areas (Determination and Findings (id. at 1, 4, 5), which is the purported "principal" public purpose of the Project (id. at 4);

(2)     An arena to be used by a major-league sports franchise, for athletic contests featuring local academic institutions, and for other entertainment and civic events (id. at 5);

(3)     Approximately 2,250 units of "affordable" rental housing and between 3,075 and 4,180 units of "market rate" housing (id.);

(4)     Between 336,000 and 1,606,000 square feet of office space (id.);

(5)     "Possibly" a hotel (id.);

(6)     Eight acres of publicly accessible space (id.);

(7)     Ground-level retail space "to activate the street frontages" (id.);

(8)     "Community facility spaces, including those offering child care and "youth and senior center service" (id. at 5-6);

(9)     A facility for the Long Island Railroad to store, clean, and inspect its trains (id. at 6);

(10)    An additional entrance to an already existing subway station (id.);

(11)    "[S]ustainability and green design" (id.); and

(12)    "[E]nvironmental remediation of the Project Site" (id.).

Plaintiffs expect that their properties will be condemned and seized "in short order" in order to effectuate the Project.

An aggrieved person may seek judicial review of the condemnor's determination and findings within thirty days of their publication. EDPL § 207(A). The EDPL provides that the aggrieved person may sue only in the Appellate Division of New York Supreme Court and only in the Department of the Appellate Division that embraces the county in which the property at issue is located. Id. Judicial review is conducted "on the record," *i.e.*, based on the record of the Section 201 hearing and the Section 204 determination and findings. Id.

The Appellate Division's review is limited to whether (1) the proceeding was in conformity with the federal and state constitutions; (2) the proposed acquisition is within the condemnor's statutory jurisdiction or authority; (3) the condemnor's determination and findings were made in accordance with procedures set forth in Article Two of the EDPL and with Article Eight of the New York Environmental Conservation Law; and (4) a public use, benefit, or

7

purpose will be served by the proposed acquisition. EDPL § 207(C). The decision of the Appellate Division may be appealed to the New York Court of Appeals. EDPL § 207(B).

Plaintiffs have chosen to bring their Section 207 claim before this court, pursuant to the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367, rather than before the Appellate Division.

## 2. Article Four

When, as in this case, the condemnor is an entity other than the State of New York, the condemnor must file a petition in New York State Supreme Court in order to acquire the condemned property. EDPL §§ 402(B), 501. This petition must be filed within three years of the latest among (1) publication of the condemnor's Section 204 determination and findings, (2) the date of the order or completion of the procedure that constitutes the basis of an exemption to Section 204 under EDPL § 206, and (3) entry of the final order or judgment based on Section 207 judicial review. EDPL § 401(A).

The condemnor's petition must set forth (a) the basis for compliance with Article Two of the EDPL, including a copy of its determination and findings; (b) an acquisition map, including the names and places of residence of condemnees; (c) a description of the real property to be acquired and its location; (d) the public use, benefit, or purpose for which the property is required; and (e) a request that the court direct entry of an order authorizing the filing of the acquisition map. EDPL § 402(B)(3). The condemnor must notify the public of the petition at least twenty days before its return date. EDPL § 402(B)(2). Any condemnee may file an answer to the petition. EDPL § 402(B)(4).

Should the court find that the procedural requirements of New York's Eminent Domain Procedure law have been met, it must enter an order granting the petition. EDPL § 402(B)(5). When the condemnor files such an order with the appropriate county clerk or register, "the acquisition of the property . . . shall be complete and title to such property shall then be vested in the condemnor." Id. After title vests in the condemnor, a condemnee may sue for just compensation. See generally EDPL Art. 5.

As of the date the Amended Complaint was filed, the FCRC had not commenced Article Four proceedings to acquire Plaintiffs' property.

## II. Procedural History

Before the court are two cases that have been consolidated.

The first case, 06-CV-5827 (the "Goldstein case"), was filed on October 26, 2006. Plaintiffs to the Goldstein case (collectively, "Goldstein") initially asserted three causes of action, each pursuant to 42 U.S.C. § 1983 and the United States Constitution: (1) a violation of the Takings Clause of the Fifth Amendment, (2) a violation of the Equal Protection clause of the Fourteenth Amendment, and (3) a violation of the Due Process clause of the Fourteenth Amendment. On December 15, 2006, all Defendants moved to dismiss the Goldstein case. On January 5, 2007, Goldstein responded to Defendants' motions to dismiss and filed an Amended Complaint, which added as a fourth cause of action a supplemental claim against the ESDC pursuant to EDPL § 207.

On January 11, 2007, the second case, 07-CV-152 (the "Piller case"), was filed by Aaron Piller and Rockwell Property Management, LLC (together, "Piller"). Piller asserted the same four causes of action as Goldstein and sued the same Defendants.

On January 19, 2007, all Defendants filed reply papers in support of their motions to dismiss the Goldstein case. Also on that date, the ESDC filed a motion to dismiss Goldstein's fourth cause of action. On January 26, 2007, Goldstein responded to the ESDC's motion to dismiss the fourth cause of action. On February 1, 2007, the ESDC filed reply papers in support of its motion to dismiss the fourth cause of action.

On February 7, 2007, Judge Levy, to whom I referred Defendants' motions to dismiss the Goldstein case, heard oral argument regarding those motions. On February 23, 2007, Judge Levy recommended that I dismiss the Goldstein case on the ground of <u>Burford</u> abstention. (Report and Recommendations (Docket No. 83[2]) at 33-42.) Judge Levy also recommended that I decline to dismiss the Goldstein case on the grounds of ripeness and <u>Younger</u> abstention. (<u>Id.</u> at 14-33.) Judge Levy did not consider whether Goldstein stated a claim upon which relief could be granted. (<u>Id.</u> at 42.)

On March 8, 2007, the Goldstein and Piller cases were consolidated. (Stipulation and Order (Docket No. 85).) The parties agreed, and this court so ordered, that "Defendants' pending motions to dismiss in the Goldstein Action, and the Goldstein Plaintiffs' opposition thereto, shall be and hereby are deemed filed in the Piller Action, and the disposition of Defendants' motions in the Goldstein Action shall be deemed to apply to the Piller Action with equal force." (<u>Id.</u> ¶ 2.)

On March 9, 2007, the parties filed objections to Judge Levy's Report and Recommendations. On March 23, 2007, the parties responded to each other's objections. On March 28, 2007, the parties filed reply papers in support of their objections. On March 30, 2007,

---

[2] Citations to Docket Numbers refer to the docket in the Goldstein case (06-CV-5827) unless otherwise indicated.

this court heard oral argument regarding those objections.  On May 22, 2007, Governor Pataki filed a supplemental letter.  On May 25, 2007, the ESDC filed a supplemental letter.  On June 5, 2007, Plaintiffs filed a supplemental letter.

This court has considered all arguments submitted by the parties to this case.

## III.  Analysis

The parties collectively challenge all of Judge Levy's recommendations.  I must therefore consider *de novo* Defendants' motions to dismiss.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

I will first address <u>Burford</u> abstention, which Judge Levy recommended I accept as a ground for dismissal.  I decline to dismiss on that ground.  I will then address ripeness and <u>Younger</u> abstention, which Judge Levy recommended I reject as grounds for dismissal.  I accept and adopt those recommendations.  I will then consider whether Plaintiffs have stated a claim upon which relief can be granted.  I find that they have not.  I therefore grant Defendants' motions to dismiss.

### A.  **<u>Burford</u> Abstention**

Defendants argue, relying on the doctrine established in <u>Burford v. Sun Oil Co.</u>, 319 U.S. 315 (1943) and its progeny, that the court must abstain from hearing this case.  The Supreme Court has summarized <u>Burford</u> abstention as follows:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the

> question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S. 350, 361 (U.S. 1989) (citation and quotation marks omitted) (hereinafter, "NOPSI"). Defendants believe, and Judge Levy recommends that I find, that this case falls into the second NOPSI category. (ESDC's 12/15/06 Br. (Docket No. 52) at 26-27; ESDC's 3/23/07 Br. (Docket No. 95) at 1, 4; FCRC's 3/23/07 Br. (Docket No. 93) at 5; City Defs.' 3/23/07 Br. (Docket No. 92) at 2; Report and Recommendation (Docket No. 83) at 33-42.)

The court declines to abstain under Burford. Such abstention would be inappropriate because federal-court review of the questions presented in this and similar cases will not disrupt New York's effort to establish a coherent eminent-domain policy. To understand why, it is necessary to consider carefully the facts of Burford,[3] the reasons abstention was appropriate in Burford and the one other Supreme Court case approving of such abstention, and the reasons Burford abstention was improper in all other cases in which the Supreme Court considered it.

### 1. Supreme Court Cases Approving Burford Abstention

#### a. Burford v. Sun Oil Co.

Although federal courts "are under a virtually unflagging obligation to exercise the jurisdiction given them . . . there are exceptional circumstances where a federal court may decline to decide a dispute properly before it." Cannady v. Valentin, 768 F.2d 501, 503 (2d Cir. 1985); see also West v. Vill. of Morrisville, 728 F.2d 130, 135 (2d Cir. 1984). "Abdication of the

---

[3] Although Burford is cited as the origin of both categories of cases identified in NOPSI, Burford itself fits into only the second of those categories, which is the category at issue in this case. Colo. River Water Conser. Dist. v. U.S., 424 U.S. 800, 814-15 (1976)

obligation to decide cases can be justified under [abstention] doctrine only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest. It was never a doctrine of equity that a federal court should exercise its judicial discretion to dismiss a suit merely because a State court could entertain it."

Colo. River, 424 U.S. at 813-14 (citations and quotation marks omitted); see also Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716 (1996); County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 189 (1959).

In Burford, the Supreme Court affirmed a district court's decision to abstain from hearing a case involving a question of state law because "[c]onflicts in the interpretation of [the] state law, dangerous to the success of state policies, are almost certain to result from the intervention of the lower federal courts." Burford, 319 U.S. at 334. The state law at issue in Burford was "the general regulatory system devised for the conservation of oil and gas in Texas, an aspect of as thorny a problem as has challenged the ingenuity and wisdom of legislatures." Id. at 318 (citation and quotation marks omitted). The plaintiff, the Sun Oil Company, contested a decision of the Texas Railroad Commission ("Commission") to permit Burford to drill four oil wells on a portion of a large oil field in East Texas. Id. at 316-17. The Supreme Court described that field as follows:

> [It] is one of the largest in the United States. It is approximately forty miles long and between five and nine miles wide, and over 26,000 wells have been drilled in it. Oil exists in the pores and crevices of rocks and sand and moves through these channels. A large area of this sort is called a pool or reservoir and the East Texas field is a giant pool. The chief forces causing oil to move are gas and water, and it is essential that the pressures be maintained at a level which will force the oil through wells to the surface. As the gas pressure is dissipated, it becomes necessary to put the well on the pump at great expense; and the sooner the gas from a field is exhausted, the more oil is irretrievably lost. Since the oil moves

through the entire field, one operator can not only draw the oil from under his own
surface area, but can also, if he is advantageously located, drain oil from the most
distant parts of the reservoir. The practice of attempting to drain oil from under
the surface holdings of others leads to offset wells and other wasteful practices;
and this problem is increased by the fact that the surface rights are split up into
many small tracts. There are approximately nine hundred operators in the East
Texas field alone.

Id. at 318-19 (citations, quotation marks, and footnotes omitted).

The Court observed that for a variety of "reasons based on geological realities," including

those just described, "each oil and gas field must be regulated as a unit for conservation

purposes." Id. at 319. The Texas state legislature delegated such regulation to the Texas

Railroad Commission ("Commission"):

The Commission, in cooperation with other oil producing states, has accepted
State oil production quotas and has undertaken to translate the amount to be
produced for the State as a whole into a specific amount for each field and for
each well. These judgments are made with due regard for the factors of full
utilization of the oil supply, market demand, and protection of the individual
operators, as well as protection of the public interest. As an essential aspect of the
control program, the State also regulates the spacing of wells. The legislature has
disavowed a purpose of requiring that the separately owned properties in any pool
should be unitized under one management, control or ownership and the
Commission must thus work out the difficult spacing problem with due regard for
whatever rights Texas recognizes in the separate owners to a share of the common
reservoir. At the same time it must restrain waste, whether by excessive
production or by the unwise dissipation of the gas and other geologic factors that
cause the oil to flow.

Id. at 320-22 (citations and quotation marks omitted).

In order to achieve the desired level of production, avoid waste, and recognize separate

owners' shares of the common reservoir, the Commission adopted Rule 37, which provided for

minimum spacing between wells, permitted exceptions where necessary to prevent waste, and

aimed to allow each surface owner to recover oil and gas "substantially equivalent in amount to

the recoverable oil and gas under his land." Id. at 322. The ostensible simplicity of this goal was

"delusive," however, because nobody could be certain just how much oil was present under the

land of each surface holder. Id. at 323.

Because the questions of waste and confiscation were interrelated, such that "decision of

one of the questions necessarily involve[d] recognition of the other," id., and because "over two-

thirds of the wells in the East Texas field exist[ed] as exceptions," id. at 324, the Commission

was charged with balancing private rights against each other and, simultaneously, against the

public interest:

> The standards applied by the Commission in a given case necessarily affect the
> entire state conservation system. Of far more importance than any other private
> interest is the fact that the over-all plan of regulation, as well as each of its case by
> case manifestations, is of vital interest to the general public which must be assured
> that the speculative interests of individual tract owners will be put aside when
> necessary to prevent the irretrievable loss of oil in other parts of the field. The
> Commission in applying the statutory standards of course considers the Rule 37
> cases as a part of the entire conservation program with implications to the whole
> economy of the state.

Id. at 324-25.

In order to balance those interests, Texas not only provided for centralized resolution of

exception disputes by the Commission, but for centralized judicial review of the Commission's

decisions:

> The Commission orders may be appealed to a State district court in Travis
> County, and are reviewed by a branch of the Court of Civil Appeals and by the
> State Supreme Court. While the constitutional power of the Commission to
> enforce Rule 37 or to make exceptions to it is seldom seriously challenged, the
> validity of particular orders from the standpoint of statutory interpretation may
> present a serious problem, and a substantial number of such cases have been

disposed of by the Texas courts which alone have the power to give definite
answers to the questions of State law posed in these proceedings.

Id. at 325 (citations omitted). Concentration of challenges to Commission orders in Travis

County was intended to prevent the "interminable confusion [that] would result" if the

Commission's decisions could be attacked in various courts. Id. at 326. In addition,

"[c]oncentration of judicial supervision of Railroad Commission orders permits the state courts,

like the Railroad Commission itself, to acquire a specialized knowledge which is useful in

shaping the policy of regulation of the ever-changing demands in this field." Id.

Sun Oil sued in federal court rather than Travis County, relying for jurisdiction on the

parties' diversity of citizenship and the contention that the Commission's order denied Sun Oil

due process. Id. at 317. The Supreme Court framed the question presented to it as, "Assuming

that the federal district court had jurisdiction, should it, as a matter of sound equitable discretion,

have declined to exercise that jurisdiction here?" Id. at 318. The Court answered that question

in the affirmative, concluding that "sound respect for the independence of state action require[d]

the federal equity court to stay its hand." Id. at 334.

Although the Court did not reduce its reasoning to a simple formula, it made clear that its

conclusion was based on five factors: (1) facts about the East Texas oil field, (2) Texas's

centralized approach to regulating oil drilling, (3) Texas's centralized system for reviewing

regulatory decisions, (4) the dangers of federal review of regulatory decisions, and (5) the nature

of the question presented in the case. I will briefly elaborate upon each.

### i.  The East Texas Oil Field

The first factor was the East Texas oil field.  The Supreme Court observed that the field had to be regulated as a single unit because each operator could, if advantageously located, draw oil from underneath land other than his own, a fact that had led to "offset wells" and other wasteful practices.  Id. at 319, 323.  In addition, the Court noted that oil was vitally important to Texas, which drew much of its revenue from taxing the oil industry – a circumstance that would exacerbate the harm from wasted oil.  Id. at 320, 324.  And wasted oil was not a mere theoretical concern: "the sooner the gas from a field is exhausted, the more oil is irretrievably lost."  Id. at 319.  For that reason, any failure to award drilling rights where oil existed, and even any slight delay in awarding such rights, would rob consumers of oil and Texas of tax revenue.

### ii.  Texas's Centralized Approach to Regulating Oil Drilling

The second factor the Court considered was "the general regulatory system devised for the conservation of oil and gas in Texas, an aspect of as thorny a problem as has challenged the ingenuity and wisdom of legislatures."  Id. at 318 (citation and quotation marks omitted).  The Court noted that Congress had chosen not to regulate oil fields, id. at 319, and that "the State's attempts to control the flow of oil and at the same time protect the interest of the many operators have from time to time been entangled in geological-legal problems of novel nature," id. at 320.

The Court then observed that in order to solve the problem of oil-field regulation, the Texas legislature gave the Commission "broad discretion in administering the law."  Id. at 320 (citation and quotation marks omitted).  The Commission proceeded by "accept[ing] State oil production quotas and [] undertak[ing] to translate the amount to be produced for the State as a

whole into a specific amount for each field and for each well." Id. at 320; see also id. at 320 n.12. "At the same time [the Commission was required to] restrain waste, whether by excessive production or by the unwise dissipation of the gas and other geological factors that cause the oil to flow." Id. at 322. And "since the waste and confiscation problems are as a matter of physical necessity so closely interrelated, decision of one of the questions necessarily involves recognition of the other." Id. at 323.

The Court found that the Commission's broad discretion was necessary in order to balance private interests against the public interest:

> [Cases] involving "confiscation", are not mere isolated disputes between private parties. Aside from the general principles which may evolve from these proceedings, the physical facts are such that an additional permit may affect pressure on a well miles away. The standards applied by the Commission in a given case necessarily affect the entire state conservation system.

Id. at 324.

### iii. Texas's Centralized System of Judicial Review of Regulatory Decisions

The third factor upon which the Supreme Court relied was the Texas state legislature's decision to concentrate a "system of thorough judicial review" of Commission decisions in a single Texas court located in Travis County. Id. at 325. Such concentration served the purposes of (1) avoiding inconsistent decisions on appeal from Commission orders, which would lead to "intolerable confusion" and, potentially, wasted oil and tax revenue, and (2) allowing the court that reviewed Commission decisions "to acquire a specialized knowledge which is useful in shaping the policy of regulation of the ever-changing demands in this field." Id. at 325, 327.

The Court observed that the Travis County court, utilizing its specialized knowledge, acted as a "working partner" with the Commission and had some arguably "legislative powers," id. at 325-27, and that its review of the Commission's decisions was "expeditious and adequate," id. at 334.

### iv.    The Dangers of Federal Review of Regulatory Decisions

Fourth, the Court relied on actual and expected problems arising from federal review of Commission decisions. It first found that the "confusion" sought to be avoided by Texas's scheme of centralized judicial review had actually resulted when federal courts had reviewed Commission decisions. The cases before those federal courts would have been better brought in state court because they "dealt primarily with the interpretation of state law, some of it state law fairly remote from oil and gas problems." Id. at 331. The federal courts misinterpreted state law and so disrupted Texas's scheme that state laws were amended, special sessions of the state legislature were called, and the Governor of Texas imposed martial law. Id. at 327-33 & n.26. In addition, the Supreme Court found that such confusion would likely result in the future should plaintiffs continue to bring federal oil field cases: "Conflicts in the interpretation of state law, dangerous to the success of state policies, are almost certain to result from the intervention of the lower federal courts." Id. at 334.

Equally importantly, the Court noted that "if the state procedure is followed from the Commission to the State Supreme Court, ultimate review of the federal questions is fully preserved here." Id. In other words, the Court found that federal-court review gave rise to tremendous risks and offered no benefits, whereas state-court review gave rise to no risks (because the federal judiciary retained the power to consider federal questions at a later date) and

had the benefit of producing correct and consistent interpretations of state law: "As a practical matter, the federal courts can make small contribution to the well organized system of regulation and review which the Texas statutes provide. Texas courts can give fully as great relief, including temporary restraining orders, as the federal courts." Id. at 327.

### v. The Question Presented in Burford

Fifth, the Court considered the nature of the question of law underlying Burford. Although Sun Oil claimed to sue in order to redress a due process violation, it apparently urged the Court to instead consider whether the Commission's decision was "reasonable" under Texas statutory law, a question distinct from that of whether the Commission afforded Sun Oil due process. Id. at 331-32; see also Quackenbush, 517 U.S. at 723 ("The principal issue presented in Burford was the 'reasonableness' of an order issued by the Texas Railroad Commission[.]")

In addition, Sun Oil's case "raised a number of [other] problems" of state law that were "of no general significance," including questions of *res judicata* and jurisdiction, regarding which "a federal court can only try to ascertain state law." Burford, 319 U.S. at 331. These state-law questions were so unsettled that abstention under Railroad Commission v. Pullman Co., 312 U.S. 496 (1941) may have been necessary in order to permit the state to issue an "authoritative determination of the difficult state questions." Burford at 331.

### b. Alabama

Like Burford, Ala. Pub. Serv. Comm'n v. S. Ry. Co., 341 U.S. 341 (1951) fits in the second NOPSI category, which is the category at issue in the present case. NOPSI, 491 U.S. at 361, 362; Colo. River, 424 U.S. at 815. Southern Railway sued to enjoin members of the Alabama Public Service Commission ("APSC") from enforcing an order that prohibited

Southern Railway from abandoning two unprofitable intrastate train routes. Alabama at 342.

Under Alabama law, the APSC's permission was a prerequisite to such abandonment. Id.

Southern Railway argued that the APSC's decision violated the right to due process. Id. at 343.

A three-judge federal trial court agreed. Id. at 343-44, 346-47. The Supreme Court reversed,

holding that the federal trial court should have abstained under Burford. Alabama at 349-51.

In reaching this conclusion, the Court relied on factors similar to those cited in Burford:

(1) facts about intrastate rail transportation, (2) Alabama's centralized approach to regulating

intrastate rail transportation, (3) Alabama's centralized system for reviewing regulatory

decisions, (4) the dangers of federal review of regulatory decisions, and (5) the nature of the

question presented in the case.

First, the Court observed that intrastate rail transportation was "primarily the concern of

the state," id. at 346, and that "the problems raised by the discontinuance of trains Nos. 7 and 8

cannot be resolved alone by reference to appellee's loss in their operation but depend more upon

the predominantly local factor of public need for the service rendered," id. at 347.

Second, the Court relied on the fact Alabama state law required railroad companies to

receive permission from the APSC before abandoning intrastate routes. Id. at 342. In denying

such permission to Southern Railway, the APSC relied on a local, fact-specific inquiry,

concluding "that there exist[ed] a public need for the service and that appellee had not attempted

to reduce losses through adoption of more economical operating methods." Id. at 343.

Third, the Court relied on Alabama's decision to concentrate judicial review of APSC decisions in a single court:

> Not only has Alabama established its Public Service Commission to pass upon a proposed discontinuance of intrastate transportation service, but it has also provided for appeal from any final order of the Commission to the circuit court of Montgomery County as a matter of right. That court, after a hearing on the record certified by the Commission, is empowered to set aside any Commission order found to be contrary to the substantial weight of the evidence or erroneous as a matter of law and its decision may be appealed to the Alabama Supreme Court. Statutory appeal from an order of the Commission is an integral part of the regulatory process under the Alabama Code. Appeals, concentrated in one circuit court, are supervisory in character.

Id. at 348 (citations and quotation marks omitted). As in Burford, the Supreme Court in Alabama cited the adequacy of this judicial review, observing that "Appellee has not shown that the Alabama procedure for review of Commission orders is in any way inadequate to preserve for ultimate review in this Court any federal questions arising out of such orders." Alabama at 349.

Fourth and fifth, the Court relied on the dangers of federal review and on the nature of the question presented, which was, in effect, a pure question of state law. Most notably, the Court observed with unsuppressed disdain "that a federal court has been asked to intervene in resolving the essentially local problem of balancing the loss to the railroad from continued operation of trains Nos. 7 and 8 with the public need for that service in Tuscumbia, Decatur, Huntsville, Scottsboro, and the other Alabama communities directly affected." Id. at 347-48.[4]

_____

[4] The ESDC nevertheless writes that in Alabama, the Supreme Court "appl[ied] Burford abstention in the absence of any difficult state-law questions." (ESDC's 3/23/07 Br. at 8.) I reject that interpretation. Indeed, the ESDC acknowledges that the Supreme Court found that Burford abstention was appropriate in Alabama "in deference to local determinations of 'public need' for railroad service in a particular case." (ESDC's 3/23/07 Br. at 18.) More importantly, the Supreme Court itself has explained that in Alabama, "the success of the railroad's constitutional challenge depended upon the predominantly local factor of public need for the service rendered." NOPSI, 491 U.S. at 361 (citing Alabama at 347; quotation marks omitted).

22

## 2. Supreme Court Cases Rejecting <u>Burford</u> Abstention

In all cases decided after <u>Alabama</u> in which the Supreme Court considered <u>Burford</u> abstention, it held that such abstention was inappropriate.

### i. <u>Allegheny</u>

In <u>County of Allegheny v. Frank Mashuda Co.</u>, 360 U.S. 185 (1959), the Supreme Court held that a district court may not abstain under <u>Burford</u> from exercising diversity jurisdiction–

> [I]n a state eminent domain case in which the exercise of that jurisdiction would not entail the possibility of a premature and perhaps unnecessary decision of a serious federal constitutional question, would not create the hazard of unsettling some delicate balance in the area of federal-state relationships, and would not even require the District Court to guess at the resolution of uncertain and difficult issues of state law.

<u>Allegheny</u> at 187. The plaintiffs in <u>Alabama</u> sued a local authority that had exercised the power of eminent domain to acquire their property, which it then leased it to a private business. <u>Id.</u> The plaintiffs sued under a state law providing that "private property cannot be taken for a private use under the power of eminent domain." <u>Id.</u> (citation and quotation marks omitted). The district court dismissed the case under an abstention theory. <u>Id.</u> at 188.

In concluding that <u>Burford</u> abstention in particular was unwarranted, the Supreme Court relied on its finding that the only question presented, although a question of state law, was a "purely factual question" ("whether the County expropriated the respondents' land for private rather than for public use," <u>Allegheny</u> at 190; <u>see also id.</u> at 196) based on state law that was "settled," <u>id.</u> at 188, "clear and certain," <u>id.</u> at 196. The Court also relied on its finding that a refusal to exercise federal jurisdiction would cause "delay and expense" to all parties, because the plaintiffs would re-file their case in state court, and especially to plaintiffs, because if their

suit had merit, they would suffer "further prolonged unlawful denial of the possession of their property." Id. at 196.

The Allegheny Court considered whether Burford abstention is more appropriate in eminent-domain cases than in other cases involving state or local issues. It concluded that it is not:

> [E]minent domain is no more mystically involved with "sovereign prerogative" than a State's power to regulate fishing in its waters, its power to regulate intrastate trucking rates, a city's power to issue certain bonds without a referendum, its power to license motor vehicles, and a host of other governmental activities carried on by the States and their subdivisions which have been brought into question in the Federal District Courts despite suggestions that those courts should have stayed their hand pending prior state court determination of state law.

Allegheny at 192 (citations to cases omitted). The Court made three observations in support of the quoted statement. First, it observed that "the federal courts have been adjudicating cases involving issues of state eminent domain law for many years, without any suggestion that there was entailed a hazard of friction in federal-state relations." Id. Second, the Court observed that it had repeatedly approved of "Federal District Courts [] decid[ing] state condemnation proceedings in proper cases despite challenges to the power of the condemning authority to take the property." Id. at 194. Third, the Court observed that Fed. R. Civ. P. 71A(k), which has not changed since Allegheny was decided, "makes perfectly clear . . . that this Court . . . intended that state eminent domain cases, including those which raised questions of authority to take land, would be tried in the Federal District Courts if jurisdiction was properly invoked." Id. at 195 (footnote omitted).[5] "Rule 71A was adopted only after a thorough investigation of eminent

---

[5] Rule 71A(k) provides in relevant part that the practice described elsewhere in Rule 71A for actions regarding the condemnation of property "governs in actions involving the exercise of the power of eminent domain under the law of a state[.]"

domain practice in the federal courts, and its provision for trying state eminent domain cases in the District Courts necessarily reflects a conclusion that this practice is unobjectionable." Id. at 195-96.

### ii. McNeese

In McNeese v. Bd. of Educ. for Cmty. Unit Sch. Dist. 187, 373 U.S. 668 (1963), African-American public-school students sued under federal law to desegregate their school. McNeese at 669. The district court dismissed the case because it found that the students had not exhausted administrative remedies available under state law. Id. at 670. The Seventh Circuit affirmed, id., and the Supreme Court reversed, id. at 676.

In reversing, the Supreme Court considered whether Burford abstention was appropriate. It found that for two reasons, it was not. First, it found that the question presented was a question of purely federal law, which was "plainly federal in origin and nature" and was not "in any way entangled in a skein of state law that must be untangled before the federal case can proceed." Id. at 674. The federal district court therefore had no reason to consider "whether respondents' conduct is legal or illegal as a matter of state law." Id. Second, the Court found that "it is by no means clear that Illinois law provides petitioners with an administrative remedy sufficiently adequate to preclude prior resort to a federal court for protection of their federal rights." Id. at 674-75.

### iii. Colorado River

In Colo. River Water Conser. Dist. v. U.S., 424 U.S. 800 (1976), the United States sought a declaration that it and several Indian tribes, rather than defendant water users, owned the right to water in certain rivers under Colorado law. Colo. River at 804-806. The United States sued in

federal district court, relying for jurisdiction on 28 U.S.C. § 1345, which provided, "Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress." Colo. River at 805. The district court dismissed the case under a general theory of abstention, although it apparently did not cite Burford in its oral decision. Id. at 806; see also U.S. v. Akin, 504 F.2d 115, 117 (10th Cir. 1974). The Tenth Circuit reversed. Colo. River at 806; Akin.

Although the Supreme Court held that dismissal was proper, it rejected the application of Burford abstention, and in particular the second category identified in NOPSI, which is the category at issue in the present case. Colo. River at 814-16. The Court offered two reasons for rejecting Burford. The first was that, as in Allegheny, "[w]hile state claims are involved in the case, the state law to be applied appears to be settled." Colo. River at 815. The second reason was that Colo. River presented "[n]o questions bearing on state policy." Id. In other words, "decision of the state claims [would not] impair efforts to implement state policy as in Burford." Id. The Court elaborated:

> To be sure, the federal claims that are involved in the case go to the establishment of water rights which may conflict with similar rights based on state law. But the mere potential for conflict in the results of adjudications, does not, without more, warrant staying exercise of federal jurisdiction. The potential conflict here, involving state claims and federal claims, would not be such as to impair impermissibly the State's effort to effect its policy respecting the allocation of state waters. Nor would exercise of federal jurisdiction here interrupt any such efforts by restraining the exercise of authority vested in state officers.

Id. at 815-16 (citations omitted).

iv.     **NOPSI**

In <u>NOPSI</u>, 491 U.S. 350 (1989), the plaintiff, a power company, sued the New Orleans

City Council ("Council") based on the Council's decision to deny an immediate rate increase that

the plaintiff sought in order to recover its share of the cost of building a nuclear power plant.[6]

<u>NOPSI</u> at 353-55.  The district court dismissed the case, relying at least in part on <u>Burford</u>, and

the Fifth Circuit affirmed.  <u>NOPSI</u> at 358.

The Supreme Court reversed because it found that the case "d[id] not involve a state-law

claim, nor even an assertion that the federal claims are 'in any way entangled in a skein of

state-law that must be untangled before the federal case can proceed.'"  <u>Id.</u> at 361 (quoting

<u>McNeese</u>, 373 U.S. at 674).  In doing so, it noted that "[w]hile <u>Burford</u> is concerned with

protecting complex state administrative processes from undue federal interference, it does not

require abstention whenever there exists such a process, or even in all cases where there is a

'potential for conflict' with state regulatory law or policy."  <u>NOPSI</u> at 362 (quoting <u>Colo. River</u>,

424 U.S. at 815-16).  It then applied this observation to the case at hand:

> Here, NOPSI's primary claim is that the Council is prohibited by federal law from
> refusing to provide reimbursement for FERC-allocated wholesale costs.  Unlike a
> claim that a state agency has misapplied its lawful authority or has failed to take
> into consideration or properly weigh relevant state-law factors, federal
> adjudication of this sort of pre-emption claim would not disrupt the State's
> attempt to ensure uniformity in the treatment of an "essentially local problem[.]"
>
> *          *          *
>
> [N]o inquiry beyond the four corners of the Council's retail rate order is needed to
> determine whether it is facially pre-empted by FERC's allocative decree and
> relevant provisions of the Federal Power Act.  Such an inquiry would not unduly

---

[6]  NOPSI was obligated to pay a share of that cost pursuant to an order of the Federal
Energy Regulatory Commission.  <u>NOPSI</u> at 354.

intrude into the processes of state government or undermine the State's ability to maintain desired uniformity. It may, of course, result in an injunction against enforcement of the rate order, but "there is . . . no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of a state policy."

NOPSI at 362-63 (quoting Ala., 341 U.S. at 347 and Zablocki v. Redhail, 434 U.S. 374, 380 n. 5 (1978), respectively).

The Court noted that NOPSI had argued, "as an alternative to its facial pre-emption challenge," that the Council's decision was a pretext for the Council's determination that NOPSI had been unwise in investing in the nuclear plant. Id. at 363. The Court conceded that "[u]nlike the facial challenge, this claim cannot be resolved on the face of the rate order, because it hinges largely on the plausibility of the Council's finding that NOPSI should have, and could have, diversified its supply portfolio and thereby lowered its average wholesale costs," and that "[a]nalysis of this pretext claim requires an inquiry into industry practice, wholesale rates, and power availability during the relevant time period, an endeavor that demands some level of industry-specific expertise." Id. It nevertheless found Burford abstention inappropriate, reasoning that because "wholesale electricity is not bought and sold within a predominantly local market, [such an inquiry] does *not* demand significant familiarity with, and will not disrupt state resolution of, distinctively local regulatory facts or policies. The principles underlying Burford are therefore not implicated." Id. at 363-64 (emphasis in original).

### v.    **Quackenbush**

In Quackenbush v. Allstate Ins. Co., 517 U.S. 706 (1996), the California Insurance Commissioner sued Allstate in state court for allegedly breaching a contract with a defunct insurer called Mission. Quackenbush at 709. Allstate removed the case to federal district court

and moved the district court to compel arbitration.  Id.  The district court abstained under Burford and remanded the case to state court because Allstate's setoff claims raised "a hotly disputed question of state law" that was the subject of a pending state case.  Quackenbush at 709-10.  The district court did not address the motion to compel arbitration.  Id. at 710.

The Ninth Circuit reversed and ordered the case to arbitration, reasoning that a district court may abstain under Burford only when the relief sought is equitable.  Quackenbush at 710, 729-30.  The Supreme Court affirmed, but rejected the Ninth Circuit's holding, which seemed to establish a *per se* prohibition on Burford abstention in non-equity cases.  The Supreme Court instead held that "federal courts have the power to dismiss or remand cases based on abstention principles only where the relief being sought is equitable *or otherwise discretionary*.  Because this was a damages action, we conclude that the District Court's remand order was an unwarranted application of the Burford doctrine."  Quackenbush at 731 (emphasis added).  The Court therefore found it unnecessary "to inquire fully as to whether this case presents the sort of 'exceptional circumstance' in which Burford abstention or other grounds for yielding federal jurisdiction might be appropriate."  Id.

It nevertheless explained that Burford abstention was inappropriate "based on a careful consideration of the federal interests in retaining jurisdiction over the dispute and the competing concern for the independence of state action."  Quackenbush at 728 (citation and quotation marks omitted).  The Court found that the federal interest in the case – the "federal concern for the enforcement of arbitration agreements" – was "pronounced," "substantial," and "emphatic."  Id. at 728-29.  It then found that this federal interest outweighed the state interest, noting that "the case appears at first blush to present nothing more than a run-of-the-mill contract dispute."  Id. at

729.  The Court recognized that federal litigation might have an "impact" on Mission's ongoing

state-court liquidation proceeding, but found that the state-law issue, which was "hotly

contested" when the district court decided to abstain, had since been resolved by the California

Supreme Court.  Id.[7]

### 3.    Application of <u>Burford</u> to the Present Case

Defendants argue that this case belongs in the second category identified in <u>NOPSI</u> and

that this court must abstain pursuant to <u>Burford</u>.  The court must therefore abstain if (1) "timely

and adequate state-court review is available" and (2) the "exercise of federal review of the

question in [this] case and in similar cases would be disruptive of state efforts to establish a

coherent policy with respect to a matter of substantial public concern."  <u>NOPSI</u>, 491 U.S. at 361

(U.S. 1989) (quotation marks and citation omitted).  I will consider each element in turn.

In considering the second element, I will be guided by the Second Circuit's identification

of four relevant factors: (1) "the degree of specificity of the state regulatory scheme," (2) "the

necessity of discretionary interpretation of state statutes," (3) "whether the subject matter of the

litigation is traditionally one of state concern," and (4) whether the state "ha[s] created a

centralized system of judicial review of commission orders, which permit[s] the state courts, like

the Railroad Commission itself [in <u>Burford</u>], to acquire a specialized knowledge of the

---

[7]  I find no need to discuss at length the facts of <u>Ankenbrandt v. Richards</u>, 504 U.S. 689
(1992).  In that case, the Supreme Court stated, in *dicta*, that <u>Burford</u> abstention may be
appropriate "in a case involving elements of a domestic relationship" if the case presents
"difficult questions of state law bearing on policy problems of substantial public import whose
importance transcends the result in the case then at bar."  <u>Ankenbrandt</u> at 705-06 (<u>quoting</u> <u>Colo.
River</u>, 424 U.S. at 814).  Such a case would fall in the first <u>NOPSI</u> category, which is not at issue
in the present case.

regulations and industry."  Bethphage Lutheran Serv., Inc. v. Weicker, 965 F.2d 1239, 1243,

1245 (2d Cir. 1992) (citations and quotation marks omitted).[8]

I will also, however, follow the Second Circuit's instruction that "[e]very abstention case

is to be decided upon its particular facts and not with recourse to some mechanical checklist."  Id.

at 1245 (citation and quotation marks omitted).  "Ultimately," looking beyond the applicable

elements, factors, and instructions, this court will abstain if and only if it finds "based on a

careful consideration of the federal interests in retaining jurisdiction over the dispute and the

competing concern for the 'independence of state action,' that the State's interests are paramount

and that a dispute would best be adjudicated in a state forum."  Quackenbush, 517 U.S. at 728

(quoting Burford, 319 U.S. at 334 and citing NOPSI, 491 U.S. at 363).  "[T]he power to dismiss

recognized in Burford represents an 'extraordinary and narrow exception to the duty of the

District Court to adjudicate a controversy properly before it.'"  Quackenbush at 728 (quoting

Colo. River, 424 U.S. at 813 (quoting Allegheny, 360 U.S. at 188)).

### a.      Timely and Adequate State-Court Review

The Second Circuit has held that EDPL § 207 affords condemnees due process.  Brody v.

Village of Port Chester, 434 F.3d 121, 132-36 (2d Cir. 2005).  The question of whether a

---

[8]  Judge Levy considered only the first three of these factors and erroneously presumed
that "a finding that the case at bar implicates the first and either of the second or third factors
weighs in favor of" abstention.  (Report and Recommendation (Docket No. 83) at 35.)  In so
presuming, Judge Levy appears to have misapplied an earlier opinion of his in which he correctly
held that when the first and either the second or third NOPSI (not Bethpage) factors are satisfied
– i.e., when timely and adequate state-court review is available and either difficult questions of
state law are presented or federal review would disrupt a coherent state policy, NOPSI, 491 U.S.
at 361 – then a court must abstain.  (Id. (citing Feiwus v. Genpar, Inc., 43 F. Supp. 2d 289, 294-
95 (E.D.N.Y. 1999) (Report and Recommendation) (Levy, M.J.)).)  This court rejects the
proposition that it must abstain if the first and either the second or third Bethpage factors favor
abstention.

procedure that affords due process is inherently "adequate" for the purpose of <u>Burford</u> analysis is

an intriguing one, and may prove critical to deciding certain cases. This is not such a case. For

the purpose of resolving the present motion, I assume that Section 207 provides timely and

adequate state-court review.

        **b.**        **Disruption of State Efforts to Establish a Coherent Policy with Respect to a Matter of Substantial Public Concern**

I will address this element using the four-factor framework adopted by the Second Circuit

in <u>Bethpage</u>. I find that each of those factors supports hearing this case rather than abstaining.

        **i.**        **Specificity**

The first factor is "the degree of specificity of the state regulatory scheme." <u>Bethpage</u>,

965 F.2d at 1243. This factor favors abstention if "state law provides a comprehensive statutory

framework to formulate policy and decide cases, including opportunities for state court review."

<u>Id.</u>

The EDPL is not "specific" in the sense relevant to <u>Burford</u> abstention because it does not

set forth the criteria by which a condemnor is to determine whether some public project is

desirable, nor even criteria by which to determine whether a project justifies the taking of some

particular piece of private property rather than another. The EDPL therefore does not provide a

framework for formulating policy or deciding cases. Instead, the EDPL applies only after the

decision to take private property has already been made. The very first instruction in the EDPL

makes this clear:

> [T]he condemnor, in order to inform the public and to review the public use to be
> served by a proposed public project and the impact on the environment and
> residents of the locality where such project will be constructed, shall conduct a

> public hearing in accordance with the provisions of this article at a location
> reasonably proximate to the property which may be acquired for such project.

EDPL § 201. This instruction assumes that the condemnor has already conceived of a public project and determined what property should be taken in order to effectuate the project. While those decisions depend on the sort of specific, local, fact-intensive inquiries from which a federal court perhaps ought to abstain, considering whether a particular taking is constitutional – as opposed to considering whether it is a good idea – does not.

This case is therefore different from Burford and Alabama. In Burford, a federal court was asked to consider whether the Commission's decision to award drilling rights to one party was "reasonable" under Texas statutory law, a standard that differed from federal constitutional standards more familiar to the court. Burford, 319 U.S. at 331-32; see also Quackenbush, 517 U.S. at 723. The Commission made its decisions by accepting overall production quotas for the entire State and determining from those quotas the amount of oil each field and each well would produce. Burford at 320, 320 n.12. The Commission was also charged with restraining waste, which resulted both from excessive production and, because of dissipation, from any delay in production. Id. at 322. It is easy to understand why the Supreme Court held that federal courts ought to abstain from considering such local and specific factors.

Similarly, in Alabama "a federal court [was] asked to intervene in resolving the essentially local problem of balancing the loss to the railroad from continued operation of trains Nos. 7 and 8 with the public need for that service in Tuscumbia, Decatur, Huntsville, Scottsboro, and the other Alabama communities directly affected." Alabama, 341 U.S. at 347-48; see also NOPSI, 491 U.S. at 361 (observing that in Alabama, "the success of the railroad's constitutional

challenge depended upon the predominantly local factor of public need for the service rendered"). Again, it is easy to understand why the Supreme Court held that federal courts should abstain from making decisions based on these local concerns. No such concerns are placed before this court by the present case.

The City Defendants argue that permitting this federal litigation to proceed would thwart "the State's policy," embodied in the EDPL, "to promote efficiency and reduce litigation." (City Defs.' 3/23/07 Br. (Docket No. 92) at 5.) The court rejects that argument. This court must abstain only if "exercis[ing] of federal review of the question in [this] case and in similar cases would be disruptive of state efforts to establish a *coherent* policy with respect to a matter of substantial public concern." NOPSI, 491 U.S. at 361 (emphasis added). My concern, therefore, is with the EDPL's coherence, not with any of its other virtues, such as reducing litigation and promoting efficiency. In considering whether the Project constitutes a "public use" under the United States Constitution, this court will not disrupt the coherence of the EDPL, a generic statutory scheme designed to deal with takings of all kinds and for a virtually infinite variety of public purposes.

The ESDC argues that "[i]f federal court adjudication [of cases such as this one] were to become a common occurrence . . . the State's effort's to ensure uniformity of treatment, avoid delay, and protect against piecemeal adjudication would be eviscerated[.]" (ESDC's 3/23/07 Br. (Docket No. 95) at 3.) That argument is also rejected. The State's interest in "uniformity of treatment" under the United States Constitution surely cannot trump the United States' interest in such uniformity. The State's interest in avoiding delay is not relevant to Burford analysis

because it is not a function of the EDPL's coherence. The court is not aware of any danger of "piecemeal adjudication" that may result if the court hears this case.

Defendants seem to conflate (1) the political process of selecting public projects and sites for condemnation and (2) the legal process of determining whether a particular project serves a "public use" under the United States Constitution. The political process is certainly one of great local interest and no or minimal federal interest, just like the "reasonableness" issue in Burford and the "public need" issue in Alabama. But this court is not being asked to evaluate the political questions underlying the Project. This case simply does not require the court to consider whether the Project is a good idea or whether it can be achieved only by taking Plaintiffs' properties as opposed to other properties or no private properties at all. Instead, the issue before this court is whether the taking of Plaintiffs' properties is rationally related to a conceivable public use, as required by the United States Constitution. Midkiff, 467 U.S. at 241. This is a question of federal law, not local policy, and I am obligated to address it.

### ii. Discretionary Interpretation of State Law

The second factor I must consider is "the necessity of discretionary interpretation of state statutes." Bethpage, 965 F.2d at 1243.

This factor was critical to the Supreme Court's decision to approve of abstention in Burford and Alabama. The primary question presented in Burford was whether the Commission's decision was "reasonable" under Texas statutory law. Burford, 319 U.S. at 331-32; see also Quackenbush, 517 U.S. at 723. In addition, Burford "raised a number of [other] problems" of state law that were "of no general significance," including questions of *res judicata* and jurisdiction, "on which a federal court can only try to ascertain state law." Burford at 331.

The Supreme Court observed that these state-law questions were so unsettled that abstention under R.R. Comm'n v. Pullman Co., 312 U.S. 496 (1941) may have been necessary in order to permit the state to issue an "authoritative determination of the difficult state questions." Burford at 331. At the same time, "[t]he constitutional challenge [in Burford] was of minimal federal importance, involving solely the question whether the commission had properly applied Texas' complex oil and gas conservation regulations." NOPSI, 491 U.S. at 360 (citing Burford at 331 & n.28).

Similarly, in Alabama "a federal court [was] asked to intervene in resolving the essentially local problem of balancing the loss to the railroad from continued operation of trains Nos. 7 and 8 with the public need for that service in Tuscumbia, Decatur, Huntsville, Scottsboro, and the other Alabama communities directly affected." Alabama, 341 U.S. at 347-48; see also NOPSI at 361.

In this case, in contrast to Burford and Alabama, the questions of state law are straightforward and largely duplicative of the questions of federal law that this court must address. I note first that it is questions of federal law that predominate, as three of Plaintiffs' four claims are based on allegations that their federal constitutional rights have been violated. The three claims do not rely in any way on state law. Therefore, however much discretionary interpretation of state law this case may require – and I find that it requires none – the need to interpret state law is dwarfed by the need to interpret the United States Constitution.

Plaintiffs' fourth claim is brought pursuant to EDPL § 207. A court considering a Section 207 challenge to a taking must consider four issues. The first is whether "the proceeding [underlying the taking] was in conformity with the federal and state constitutions." EDPL §

36

207(C)(1).  Because the reviewing court, whether federal or state, must interpret the constitution with which the other has greater experience, federal and state courts are equally competent to resolve this issue.  Furthermore, it appears that the takings provisions of the federal and state constitutions are coterminous, as both constitutions require the court to consider whether a taking is rationally related to a conceivable public purpose.  See Hawaii Hous. Auth. v. Midkiff, 467 U.S. 229, 241 (1984) (United States Constitution); West 41st St. Realty LLC v. New York State Urban Dev. Corp., 744 N.Y.S.2d 121, 125 (N.Y. App. Div. 1st Dep't 2002) (New York Constitution).[9]

The second Section 207 issue is whether "the proposed acquisition is within the condemnor's statutory jurisdiction or authority."  EDPL § 207(C)(2).  Plaintiffs' Section 207 challenge does not incorporate any allegations relevant to this issue.  (See Am. Compl. ¶¶ 171-80.)

The third Section 207 issue is whether "the condemnor's determination and findings were made in accordance with procedures set forth in this article and with article eight of the environmental conservation law."  EDPL § 207(C)(3).  The only allegation relevant to this issue is that "ESDC violated section 204(a) of the EDPL by failing to make its determination and findings within 90 days of the stated close of the public hearing on August 23, 2006."  (Am. Compl. ¶ 178.)  This court is competent to consider that allegation, which does not require the court to engage in discretionary interpretation of any state law.

---

[9]  That abstention is unwarranted is supported by the fact that no state constitutional issue seems to be at play in this case.  Plaintiffs' Section 207(C)(1) claim is that "[t]he Determination and Findings do not conform, and result from proceedings that did not conform, with the United States Constitution."  (Am. Compl. ¶ 176.)  That claim does not refer to the New York Constitution.

The fourth and final Section 207 issue is whether "a public use, benefit or purpose will be served by the proposed acquisition."  EDPL § 207(C)(4).  This court need not engage in discretionary interpretation of any state statute in order to ascertain the meaning of the phrase "public use."  In order to find a public use, this court must merely find "an evident utility on the part of the public."  West 41st St. Realty, 744 N.Y.S.2d at 125.  As long as the public use is "dominant" in relation to whatever private benefits may exist, the taking serves a public use.  Kaufmann's Carousel, Inc. v. City of Syracuse Indus. Dev. Agency, 750 N.Y.S.2d 212, 221 (N.Y. App. Div. 4th Dep't 2002); Bergen Swamp Pres. Soc'y v. Village of Bergen, 741 N.Y.S.2d 363, 364 (N.Y. App. Div. 4th Dep't 2002).  This court is competent to apply those settled rules, and there is no danger that in doing so it will become "in any way entangled in a skein of state law that must be untangled before the federal case can proceed."  McNeese, 373 U.S. at 674.

### iii.    Subject Matter of the Litigation

The third factor the Second Circuit has identified as relevant to Burford analysis is "whether the subject matter of the litigation is traditionally one of state concern."  Bethpage, 965 F.2d at 1243.  Eminent domain is traditionally a matter of both state and federal concern.  While the impact of a particular public project and associated taking is felt locally, the right not to have one's property taken other than to serve a public use is enshrined in the United States Constitution.  In addition, "the presence of a federal basis for jurisdiction," which exists in this case because three of Plaintiffs' claims allege violations of federal constitutional rights, "may raise the level of justification needed for abstention."  Colo. River, 424 U.S. at 815 n.21; see also County of Suffolk v. Long Island Lighting Co., 907 F.2d 1295, 1308 (2d Cir. 1990).

In <u>Allegheny</u>, the Supreme Court observed that the issue of eminent domain has long been a concern of federal courts. The Court relied in part on this historical observation in concluding that <u>Burford</u> abstention was not appropriate in the eminent-domain case before it, noting that eminent domain is not "mystically involved with [a state's] 'sovereign prerogative'" and that "the federal courts have been adjudicating cases involving issues of state eminent domain law for many years, without any suggestion that there was entailed a hazard of friction in federal-state relations." <u>Allegheny</u>, 360 U.S. at 192.

This court therefore rejects Defendants' argument that the federal judiciary should allow state courts to develop law established in the United States Constitution. Justice O'Connor put it best when she wrote that deferring to state courts to develop the law of takings would be "an abdication of our responsibility. States play many important functions in our system of dual sovereignty, but compensating for our refusal to enforce properly the Federal Constitution (and a provision meant to curtail state action, no less) is not among them." <u>Kelo v. City of New London</u>, 545 U.S. 469, 504 (2005) (O'Connor, J., dissenting) (citation omitted).

### iv. Judicial Review

The fourth factor I must consider is whether the state "ha[s] created a centralized system of judicial review of commission orders, which permit[s] the state courts, like the Railroad Commission itself [in <u>Burford</u>], to acquire a specialized knowledge of the regulations and industry." <u>Bethpage</u>, 965 F.2d at 1245. As the Supreme Court observed in <u>NOPSI</u>, this element was critical to the decisions to abstain in <u>Burford</u> and <u>Alabama</u>. <u>NOPSI</u> at 360-61. A brief look at those cases demonstrates that they are materially different from the case now before this court.

In <u>Burford</u>, judicial review was concentrated in a single court located in Travis County. <u>Burford</u> 319 U.S. at 325. Such concentration served the purposes of (1) avoiding inconsistent decisions on appeal from Commission orders, which would lead to "intolerable confusion" and, potentially, wasted oil and tax revenue, and (2) allowing the court that reviewed Commission decisions "to acquire a specialized knowledge which is useful in shaping the policy of regulation of the ever-changing demands in this field." <u>Id.</u> at 325, 327. The Travis County court acted as a "working partner" with the Commission and had some arguably "legislative powers." <u>Id.</u> at 325-27. In addition, its review of the Commission's decisions was "expeditious and adequate." <u>Id.</u> at 334.

In <u>Alabama</u>, the Supreme Court found that the "right of statutory appeal concentrated in one circuit court which exercised supervisory powers was . . . an integral part of the regulatory process under the Alabama Code." <u>NOPSI</u> at 361 (<u>citing</u> <u>Alabama</u>, 341 U.S. at 348) (quotation marks omitted). As in <u>Burford</u>, the Court characterized this judicial review as adequate. <u>Alabama</u>, 341 U.S. at 349.

In this case, by contrast, judicial review is concentrated in the entire Appellate Division, which consists of four Departments located in different parts of the state. It is therefore unlikely that any particular judge or Department will develop the sort of expertise regarding eminent domain cases that Travis County judges developed regarding oil-drilling or Montgomery County judges developed regarding the public need for rail service.

If the New York legislature had wanted to foster such expertise, it could have done so. Indeed, it has done so in other areas of law. For example, whereas appeals of most administrative decisions may be brought "in any county within the judicial district where the

40

proceeding is triable," N.Y. C.P.L.R. § 506(a), the following appeals may be brought only in the trial court located in Albany County:

> [A] proceeding against the regents of the university of the state of New York, the commissioner of education, the commissioner of taxation and finance, the tax appeals tribunal except as provided in section two thousand sixteen of the tax law, the public service commission, the commissioner or the department of transportation relating to articles three, four, five, six, seven, eight, nine or ten of the transportation law or to the railroad law, the water resources board, the comptroller or the department of agriculture and markets[.]

N.Y. C.P.L.R. § 506(b)(2). Had the New York legislature wished to endow a court with expertise regarding eminent domain cases, it could have similarly provided that Section 207 proceedings may be brought in only one particular county or Department of the Appellate Division.

But there is no need for such expertise. The questions presented by a Section 207 claim are straightforward and do not require the sort of technical knowledge that may be helpful when determining whether a decision to grant oil-drilling rights was reasonable, Burford, or whether there is a public need for a particular rail route, Alabama. The EDPL provides for review in the four Appellate Division departments rather than in New York's trial courts not to promote expertise, but rather for the sake of expedience.

Furthermore, nearly all cases that are commenced in New York trial courts are appealable to the Appellate Division. N.Y. C.P.L.R. § 5701(a)(1) ("An appeal may be taken to the appellate division as of right in an action, originating in the supreme court or a county court from any final or interlocutory judgment except one entered subsequent to an order of the appellate division which disposes of all the issues in the action"). To say that the Appellate Division has developed

"expertise" with regard to all types of cases would be to rob the word "expertise" of the specific meaning it has in the context of <u>Burford</u> abstention.

*     *     *

The Supreme Court has explained that "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule." <u>Colo. River</u>, 424 U.S. at 813. This is because federal district courts are obligated to hear cases within their jurisdiction; indeed, that is the very reason they exist:

> The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it. Abdication of the obligation to decide cases can be justified under this doctrine only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest. It was never a doctrine of equity that a federal court should exercise its judicial discretion to dismiss a suit merely because a State court could entertain it.

<u>Id.</u> at 813-814. In <u>Burford</u>, the Supreme Court "approved the District Court's dismissal of the complaint on a number of grounds that were unique to that case." <u>Quackenbush</u>, 517 U.S. at 725. This case does not present similar exceptional circumstances that compel me to abdicate my obligation to exercise this court's jurisdiction. I therefore decline to abstain.

**B.      Ripeness and <u>Younger</u> Abstention**

Defendants argue that this case must be dismissed as unripe and that this court must abstain under the doctrine set forth in <u>Younger v. Harris</u>, 401 U.S. 37 (1971). Judge Levy recommended that I decline to dismiss this case on either of those two grounds. I have considered both of those grounds *de novo*. I accept and adopt Judge Levy's reasoning and recommendation as to both of those grounds.

### C. Public Use Analysis

Defendants also move to dismiss on the theory that Plaintiffs have failed to state a claim for a violation of the Takings Clause of the Fifth Amendment to the United States Constitution, which provides that "private property [shall not] be taken for public use, without just compensation." The Takings Clause imposes two requirements on the exercise of eminent domain to take private property: "the taking must be for a 'public use' and 'just compensation' must be paid to the owner." Brown v. Legal Found. of Wash., 538 U.S. 216, 231-232 (2003); Brody v. Village of Port Chester, 434 F.3d 121, 127 (2d Cir. 2005). The public use requirement, which is the requirement at issue in this case, applies to the states via the Fourteenth Amendment. Kelo v. City of New London, 545 U.S. 469, 472 n.1 (2005); Brody at 127.

I find that Plaintiffs have not sufficiently alleged that the takings at issue violate the public use requirement. I therefore must dismiss this case. My discussion begins with the three Supreme Court cases that define the boundaries of the public use requirement: Berman v. Parker, 348 U.S. 26 (1954), Hawaii Hous. Auth. v. Midkiff, 467 U.S. 229 (1984), and Kelo.

#### 1. Berman v. Parker

In Berman, the Supreme Court considered Congress's decision to condemn private property in Washington, D.C. in order to alleviate conditions found to be "injurious to the public health, safety, morals, and welfare." Berman at 28. Congress passed a statute that authorized the District of Columbia Land Agency to lease or sell portions of the condemned property "to a redevelopment company, individual, or partnership." Id. at 30. The owners of a department store sued to enjoin the taking of their property, arguing that their property "is commercial, not

residential property; it is not slum housing; it will be put into the project under the management of a private, not a public, agency and redeveloped for private, not public, use."  Id. at 31.

The Supreme Court found constitutional both the statute and its application to the plaintiffs even though the plaintiffs' property was not blighted and was likely to be transferred to a private entity.  The Court first observed that the statute was enacted pursuant to Congress's police power over Washington, D.C., and then stated that "[t]he role of the judiciary in determining whether that power is being exercised for a public purpose is an extremely narrow one."  Id. at 31-32.  The Court found that in enacting the statute at issue, Congress had acted for a public purpose – the creation of a "better balanced, more attractive community," id. at 31 – that qualified as a "public use" under the Takings Clause.  Id. at 32-33.

The Court rejected the plaintiffs' argument "that since their building does not imperil health or safety nor contribute to the making of a slum or a blighted area, it cannot be swept into a redevelopment plan by the mere dictum of the Planning Commission or the Commissioners."  Id. at 34.  Instead, the Court deferred to the decision of "Congress and its authorized agencies [to] attack the problem of the blighted parts of the community on an area rather than on a structure-by-structure basis" in order to best prevent the area from reverting to slum or blighted conditions.  Id.  The Court concluded, "Property may of course be taken for this redevelopment which, standing by itself, is innocuous and unoffending."  Id. at 35.

Having found that taking plaintiffs' property served a public use, the Court announced that it would not evaluate the means chosen to effectuate that use:

> Once the object is within the authority of Congress, the right to realize it through
> the exercise of eminent domain is clear.  For the power of eminent domain is
> merely the means to the end. . . . Here one of the means chosen is the use of

private enterprise for redevelopment of the area. Appellants argue that this makes the project a taking from one businessman for the benefit of another businessman. But the means of executing the project are for Congress and Congress alone to determine, once the public purpose has been established.

*    *    *

Once the question of the public purpose has been decided, the amount and character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch.

Id. at 33, 35-36 (citations omitted).

### 2.    Hawaii Housing Authority v. Midkiff

In Midkiff, the Supreme Court considered whether the public use requirement "prohibits the State of Hawaii from taking, with just compensation, title in real property from lessors and transferring it to lessees in order to reduce the concentration of ownership of fees simple in the State." Midkiff, 467 U.S. at 231-32. The Court found that such a taking served a public use and was therefore constitutional.

The Hawaii legislature found that forty-seven percent of the state's land was owned by seventy-two private landowners. Id. at 232. The legislature "concluded that concentrated land ownership was responsible for skewing the State's residential fee simple market, inflating land prices, and injuring the public tranquility and welfare." Id. In order to solve those problems, the legislature enacted a statute that authorized a state agency to condemn residential tracts and transfer fees simple from landowners to lessees. Id. at 233-34.

The landowners sued, arguing that the statute was unconstitutional because it transferred property from one private party to another and therefore did not perform a public use. The district court disagreed, reasoning that "the [statute's] goals were within the bounds of the State's

police powers and [] the means the legislature had chosen to serve those goals were not arbitrary, capricious, or selected in bad faith." Id. at 235. The Ninth Circuit reversed, concluding that the statute "was simply a naked attempt on the part of the state of Hawaii to take the private property of A and transfer it to B solely for B's private use and benefit." Id. (citation and quotation marks omitted).

The Supreme Court found the statute constitutional. Its starting point was Berman, which it read as holding in part that "[t]he 'public use' requirement is [] coterminous with the scope of a sovereign's police powers." Midkiff at 240. In affirming this holding, the Court explicitly rejected the Ninth Circuit's reading of Berman as "requiring that [the] government possess and use property at some point during a taking" in order for the taking to have a public use. Id. at 243.

The Court then affirmed that, as it held in Berman, the judiciary's role in reviewing a legislature's judgment as to what constitutes a public use is "extremely narrow." Midkiff at 240 (citing Berman at 32). More specifically, the Court held that the judiciary "will not substitute its judgment for a legislature's judgment as to what constitutes a public use unless the use be palpably without reasonable foundation." Midkiff at 241 (citation and quotation marks omitted); see also id. at 244 ("[I]f a legislature, state or federal, determines there are substantial reasons for an exercise of the taking power, courts must defer to its determination that the taking will serve a public use.").

The Court rejected the argument that because the properties at issue were being transferred to private parties, the takings were unconstitutional:

> To be sure, the [Supreme] Court's cases have repeatedly stated that one person's property may not be taken for the benefit of another private person without a justifying public purpose, even though compensation be paid. . . . But where the exercise of the eminent domain power is rationally related to a conceivable public purpose, the Court has never held a compensated taking to be proscribed by the Public Use Clause.

Id. at 241 (citations and quotation marks omitted).  In other words, "[t]he mere fact that property taken outright by eminent domain is transferred in the first instance to private beneficiaries does not condemn that taking as having only a private purpose. . . . [I]t is only the taking's purpose, and not its mechanics, that must pass scrutiny under the Public Use Clause."  Id. at 243-44.  On the other hand, the Court explained, a "purely private" taking, *i.e.*, a taking "executed for no reason other than to confer a private benefit on a particular private party," would be unconstitutional because "it would serve no legitimate purpose of government."  Id. at 245.  The Court found that "no purely private taking [wa]s involved" in the case before it.  Id.

The Court then considered the Hawaii statute's purpose and the means chosen to achieve that purpose, employing the following standard:  "When the legislature's purpose is legitimate and its means are not irrational, [Supreme Court] cases make clear that empirical debates over the wisdom of takings – no less than debates over the wisdom of other kinds of socioeconomic legislation – are not to be carried out in the federal courts."  Id. at 242-43.  Regarding the statute's purpose, the Court found that "[r]egulating oligopoly and the evils associated with it is a classic exercise of a State's police powers" that qualifies as a public use.  Id. at 242.  The Court then found that the legislature's means of regulating oligopoly constituted "a comprehensive and

rational approach to identifying and correcting market failure." Id.  Because its purpose was

legitimate and its means rational, "the Hawaii statute must pass the scrutiny of the Public Use

Clause." Id. at 243.

### 3. Kelo v. City of New London

In Kelo, the Supreme Court considered "whether a city's decision to take property for the

purpose of economic development satisfies the 'public use' requirement of the Fifth

Amendment." Kelo, 545 U.S. at 477.  A five-justice majority answered in the affirmative.

The State of Connecticut sought to revitalize the City of New London, which had suffered

"decades of economic decline," and in particular its troubled Fort Trumbull neighborhood.  Id. at

473.  Shortly after Connecticut authorized bond issues to fund this revitalization and delegated

certain planning functions to the New London Development Corporation ("NLDC"), the

pharmaceutical company Pfizer announced plans to build a $300 million research facility

adjacent to Fort Trumbull.  Id.

The NLDC then announced a development plan that capitalized on Pfizer's facility.  Id. at

473-74.  The area to be developed contained approximately 115 privately owned properties and

other land.  Id. at 474.  The plan would take those properties and create a state park, a waterfront

hotel with restaurants and shops, marinas for recreational and commercial uses, an urban

neighborhood consisting of approximately eighty new residences, a United States Coast Guard

Museum, more than 90,000 square feet of research and development office space next to the

Pfizer facility, a 2.4-acre site used to support either the state park (by providing parking or retail

services) or a marina, additional office and retail space, parking, land for "water-dependent

commercial uses," and a pedestrian riverwalk connecting the waterfront areas of the development

Id. at 473-74.  The development plan was intended to "creat[e] jobs, generat[e] tax revenue, . . .

build momentum for the revitalization of downtown New London, . . . make the City more

attractive and [] create leisure and recreational opportunities on the waterfront and in the park."

Id. at 474-75 (citation and quotation marks omitted).

Plaintiffs were long-time residents of Fort Trumbull who owned properties that were

condemned in order to create the aforementioned research and development office space and the

2.4-acre site to support the state park or a marina.  Id. at 475.  Plaintiffs' properties were not

blighted or otherwise in poor condition; "rather, they were condemned only because they

happen[ed] to be located in the development area."  Id.  Plaintiffs sued in Connecticut state court,

arguing that taking their properties would violate the public use requirement.  Id.  The state trial

court enjoined the City of New London from taking any of the properties to be used for park or

marina support but declined to enjoin the taking of properties to be used for office space.  Id.

475-76.  Both sides appealed to the Supreme Court of Connecticut, which held that all of the

proposed takings were valid because economic development was a public use under the Fifth

Amendment and the takings were "reasonably necessary" to effectuate public use.  Id. at 476-77.

A five-justice majority of the United States Supreme Court affirmed.  It began by citing

two uncontroversial propositions, neither of which adequately captured the case before the Court.

Id. at 477.  The first was that "the sovereign may not take the property of A for the sole purpose

of transferring it to another private party B, even though A is paid just compensation."  Id.  The

majority derived this proposition from Midkiff's teaching that "[a] purely private taking could

not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of

government and would thus be void."  Kelo at 477 (quoting Midkiff, 467 U.S. at 245).  In citing

49

this proposition, the majority also wrote, without citing any precedent, "Nor would the City be allowed to take property under the mere pretext of a public purpose, when its actual purpose was to bestow a private benefit." Kelo at 478.

The majority observed that the case before it could not be resolved by relying only on this first proposition because the case did not concern a "purely private taking," and instead involved a "carefully considered" development plan, and because there was no evidence of any illegitimate purpose motivating the plan (such as a purpose to benefit Pfizer or another private entity). Id. at 478 & n.6. Indeed, the majority noted, the identities of the private entities who would benefit were not known when the plan was adopted, and "[i]t is, of course, difficult to accuse the government of having taken A's property to benefit the private interests of B when the identity of B was unknown." Id. at 478 n.6.

The second uncontroversial, but inapplicable, proposition was that "a State may transfer property from one private party to another if future 'use by the public' is the purpose of the taking." Id. at 477. The case did not fit this proposition because it was "not a case in which the City is planning to open the condemned land – at least not in its entirety – to use by the general public. Nor will the private lessees of the land in any sense be required to operate like common carriers, making their services available to all comers." Id. at 478.

The majority observed, however, that a taking could be constitutional even if it did not lead to "use by the public" of the taken property. Id. at 479-80. Relying on Berman, Midkiff, and Ruckelshaus v. Monsanto Co., 467 U.S. 986 (1984)[10], the majority observed that "public use

---

[10] In Ruckelshaus, the Supreme Court upheld a statute permitting the Environmental Protection Agency to consider the trade secrets of a prior pesticide applicant when reviewing a subsequent applicant who pays just compensation to the prior applicant.

jurisprudence has wisely eschewed rigid formulas and intrusive scrutiny in favor of affording legislatures broad latitude in determining what public needs justify the use of the takings power." Kelo at 483. Affirming the thrust of this jurisprudence, the majority ruled that "[b]ecause [the NLDC's] plan unquestionably serves a public purpose" – which the Court characterized as "a program of economic rejuvenation" – "the takings challenged here satisfy the public use requirement of the Fifth Amendment." Id. at 483-84. In so ruling, the majority rejected the plaintiff's proposed holding "that economic development does not qualify as a public use," writing that "there is no basis for exempting economic development from our traditionally broad understanding of public purpose." Id. at 484.

The majority also rejected two assertions made by the Kelo dissenters. The first was that in Berman, the Court held merely that the elimination of blight is a public use. The majority read Berman more broadly: "The public use described in Berman extended beyond [eliminating blight] to encompass the purpose of *developing* that area to create conditions that would prevent a reversion to blight in the future." Kelo at 484 n.13 (citing Berman, 348 U.S. at 34-35) (emphasis in original). The second assertion was that "the government may only take property and transfer it to private parties when the initial taking eliminates some 'harmful property use.'" Kelo at 486 n.16. In rejecting this assertion, the Kelo majority observed that "[t]here was nothing 'harmful' about the nonblighted department store at issue in Berman" or the trade secrets at issue in Ruckelshaus. Id.

Finally, the majority rejected the plaintiffs' proposal that courts "require a 'reasonable certainty' that the expected public benefits will actually accrue." Id. at 487. The majority deemed this proposal impractical:

> The disadvantages of a heightened form of review are especially pronounced in this type of case. Orderly implementation of a comprehensive redevelopment plan obviously requires that the legal rights of all interested parties be established before new construction can be commenced. A constitutional rule that required postponement of the judicial approval of every condemnation until the likelihood of success of the plan had been assured would unquestionably impose a significant impediment to the successful consummation of many such plans.

Id. at 488. In support of this conclusion, the majority quoted and affirmed Midkiff's deferential approach to evaluating takings: "When the legislature's purpose is legitimate and its means are not irrational, our cases make clear that empirical debates over the wisdom of takings – no less than debates over the wisdom of other kinds of socioeconomic legislation – are not to be carried out in the federal courts." Id. (quoting Midkiff, 467 U.S. at 242).

Justice Kennedy, who joined the majority opinion in its entirety, issued a concurrence in which he wrote that "[a] court applying rational-basis review under the Public Use Clause should strike down a taking that, by a clear showing, is intended to favor a particular private party, with only incidental or pretextual public benefits." Id. at 491. Justice Kennedy derived this rule from two Equal Protection cases. In the first, the Supreme Court considered a provision of the Food Stamp Act of 1964 that excluded from participation in the food stamp program any household containing an individual who is unrelated to any other member of the household. U.S. Dep't of Agric. v. Moreno, 413 U.S. 528, 529 (1973). The Court found that this provision failed the rational-basis test because one possible purpose, "to prevent so-called 'hippies' and 'hippie communes' from participating in the food stamp program," was not a legitimate government

purpose and the provision was not rationally related to the other ostensible purpose, preventing fraud.  Id. at 533-36.

In the second Equal Protection case, the Supreme Court held that the mentally retarded are not a class deserving special protection beyond that afforded by rational-basis review.  City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432 (1985).  The Court observed that the mentally retarded are nevertheless protected by the Equal Protection Clause:

> Our refusal to recognize the retarded as a quasi-suspect class does not leave them entirely unprotected from invidious discrimination.  To withstand equal protection review, legislation that distinguishes between the mentally retarded and others must be rationally related to a legitimate governmental purpose.  This standard, we believe, affords government the latitude necessary both to pursue policies designed to assist the retarded in realizing their full potential, and to freely and efficiently engage in activities that burden the retarded in what is essentially an incidental manner.  The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational.  Furthermore, some objectives – such as a bare desire to harm a politically unpopular group – are not legitimate state interests.

Id. at 446-447 (citations, quotation marks, and ellipses within quotation marks omitted).

Justice Kennedy, reasoning by analogy to Moreno and Cleburne, wrote that "[a] court confronted with a plausible accusation of impermissible favoritism to private parties should treat the objection as a serious one and review the record to see if it has merit, though with the presumption that the government's actions were reasonable and intended to serve a public purpose." Kelo at 491.  He found that the trial court in Kelo had conducted such a review and had properly concluded that the primary motivation for the development plan was to take advantage of Pfizer's presence, rather than to benefit Pfizer or some other private entity.  Id. at

492. Justice Kennedy noted approvingly that the trial court's conclusion was based on extensive fact-finding:

> The trial court considered testimony from government officials and corporate officers; documentary evidence of communications between these parties; respondents' awareness of New London's depressed economic condition and evidence corroborating the validity of this concern; the substantial commitment of public funds by the State to the development project before most of the private beneficiaries were known; evidence that respondents reviewed a variety of development plans and chose a private developer from a group of applicants rather than picking out a particular transferee beforehand; and the fact that the other private beneficiaries of the project are still unknown because the office space proposed to be built has not yet been rented.

Id. at 491-92 (citations, quotation marks, and ellipses within quotation marks omitted).

Justice Kennedy wrote that although there may be takings cases in which a more stringent standard of review than that set forth in Berman and Midkiff ought to apply, Kelo was not such a case because (1) the Kelo taking "occurred in the context of a comprehensive development plan meant to address a serious city-wide depression," (2) "the projected economic benefits of the project cannot be characterized as *de minimis*," (3) "[t]he identity of most of the private beneficiaries [of the Kelo project] were unknown at the time the city formulated its plans," and (4) "[t]he city complied with elaborate procedural requirements that facilitate review of the record and inquiry into the city's purposes." Id. at 493.

Four justices dissented in Kelo, finding that the purposes served by the takings were "incidental public benefits resulting from the [] ordinary use of private property" and concluding that such benefits should not "render economic development takings 'for public use'" under the Fifth Amendment. Id. at 494.

The dissenters read Berman and Midkiff as holding that "in certain circumstances and to meet certain exigencies, takings that serve a public purpose [] satisfy the Constitution even if the property is destined for subsequent private use." Kelo at 498. The dissenters emphasized that those cases did not abrogate the "bedrock principle" that "[a] purely private taking could not withstand the scrutiny of the public use requirement." Id. at 500 (quoting Midkiff at 245).

Though the dissenters would affirm the results of Berman and Midkiff, they did not believe that public use is coterminous with the police power, a rule they attributed to "errant language" in Berman and Midkiff. Id. at 501. Rather, the dissenters believed that the takings in Berman and Midkiff were upheld as public uses not because they were exercises of police power – which the Kelo dissenters agreed they were – but because they eliminated the harms of blight and concentrated ownership, respectively. Id. at 500-01. "Because each taking *directly* achieved a public benefit, it did not matter that the property was turned over to private use." Id. at 500 (emphasis in original). The passage stating that the public use requirement is coterminous with the police power was therefore *dicta*. Id. "Here, in contrast, New London does not claim that [the plaintiffs'] well-maintained homes are the source of any social harm." Id.

The dissenting justices criticized both the majority and Justice Kennedy for proposing that the judiciary inquire into the motivations underlying a taking:

> Even if there were a practical way to isolate the motives behind a given taking, the gesture toward a purpose test is theoretically flawed. If it is true that incidental public benefits from new private use are enough to ensure the "public purpose" in a taking, why should it matter, as far as the Fifth Amendment is concerned, what inspired the taking in the first place? How much the government does or does not desire to benefit a favored private party has no bearing on whether an economic development taking will or will not generate secondary benefit for the public. And whatever the reason for a given condemnation, the effect is the same from the

constitutional perspective – private property is forcibly relinquished to new
private ownership.

Kelo at 502-03.

Justice Thomas, who joined the dissent just described, also wrote separately to express

that the majority opinion "is simply the latest in a string of [Supreme Court] cases construing the

Public Use Clause to be a virtual nullity, without the slightest nod to its original meaning." Id. at

506. Justice Thomas agreed that the judiciary should not review the wisdom of takings

legislation, but he felt that the majority opinion invited such review:

> I share the Court's skepticism about a public use standard that requires courts to
> second-guess the policy wisdom of public works projects. The "public purpose"
> standard this Court has adopted, however, demands the use of such judgment, for
> the Court concedes that the Public Use Clause would forbid a purely private
> taking. It is difficult to imagine how a court could find that a taking was purely
> private except by determining that the taking did not, in fact, rationally advance
> the public interest.

Id. at 520-21 (citations omitted). Justice Thomas would therefore overrule Berman and Midkiff

and would hold that a taking serves a public use only if it results in the government owning the

property or the public having a legal right to use the property. Id. at 508, 521.

### 4.    Application to the Present Case

In the line of cases just discussed, the Supreme Court held that a taking fails the public

use requirement if and only if the uses offered to justify it are "palpably without reasonable

foundation," Midkiff at 241, such as if (1) the "sole purpose" of the taking is to transfer property

to a private party, Kelo at 477; Midkiff at 245, or (2) the asserted purpose of the taking is a "mere

pretext" for an actual purpose to bestow a private benefit, Kelo at 478. I will consider whether

this case fits into either of these two categories. In doing so, I will apply the recently announced

rule that in order to survive a motion to dismiss for failure to state a claim, Plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1974 (2007). If they instead "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." Id.

### a. "Sole Purpose" to Transfer Property to a Private Party

Plaintiffs argue that the uses offered to justify the Project, which are listed *supra* at 6-7, are chimerical because (1) the Project will generate no or minimal economic benefits, (2) the Project will not create jobs, (3) the area to be condemned is not blighted, and (4) the Project will not materially increase available affordable housing. (Am. Compl. ¶ 140.) Plaintiffs therefore would ask this court or a jury to conclude that "[t]he public does not benefit from the taking of Plaintiffs' properties" at all. (Id. ¶ 135.)

That conclusion is baseless and may be rejected even at this early stage of the litigation. Each of the four allegations just listed, when examined carefully, concerns only the measure of a public benefit – as opposed to its existence – or otherwise fails to state a claim. First, although Plaintiffs allege that the net gain in tax revenues will be lower than Defendants have predicted, they do not allege that there will be no net gain. (Id. ¶¶ 90-97.) Second, and similarly, although Plaintiffs allege that Defendants' claims about job creation are overstated, they do not suggest that the Project will fail to create jobs. (Id. ¶¶ 117-20.)

Third, Plaintiffs assert either that the Takings Area is not blighted or that whatever blight may exist was caused by FCRC. But Plaintiffs do not dispute that the majority of the Project Area – which encompasses the Takings Area – is blighted, and in fact they seem to concede that

it is.[11]  (Id. ¶¶ 55, 57-58, 98-106.)  In addition, the blight study conducted by the ESDC, which is incorporated by reference into Plaintiffs' allegations, indicates that the Takings Area is blighted. (Blight Study at C-70 to C-242.)  The Project is therefore permissible even if Plaintiffs' own properties are not blighted, because "[p]roperty may of course be taken for [] redevelopment which, standing by itself, is innocuous and unoffending" if the redevelopment is intended to cure and prevent reversion to blight in some larger area that includes the property.  Berman, 348 U.S. at 35.

Fourth, Plaintiffs allege that the Project might result in fewer units of affordable housing than Defendants predict and that "[v]iewed from the perspective of residents' income, the affordable units proposed from the Project will not remotely offset the impact of the luxury housing" that the Project will provide.  (Am. Compl. ¶¶ 107-16.)  But Plaintiffs do not allege that the Project will fail to achieve a significant net increase in housing units in the area, and it is clear that it is intended to do so.[12]  Whether these units are sufficiently affordable may be an important political question, and if the citizens of Brooklyn are unsatisfied with the answers, then elected officials and their political parties may pay the price at the polls.  But the Constitution does not enshrine Plaintiffs' value judgment that a taking lacks a public purpose if it results in

---

[11]  Defendants have explained, and the Amended Complaint appears to concede, that the ATURA area, which comprises a significant portion of the Project Area, has been designated blighted ten times, first in 1968 and most recently in 2004.  (ESDC's 12/15/06 Br. at 5; Am. Compl. ¶¶ 55, 57.)

[12]  Whether the Project will in fact achieve this or any other objective is not a matter that this court may consider.  Kelo, 545 U.S. at 488 (rejecting the argument that courts should require a "reasonable certainty" that expected public benefits will accrue; reasoning that "[a] constitutional rule that required postponement of the judicial approval of every condemnation until the likelihood of success of the plan had been assured would unquestionably impose a significant impediment to the successful consummation of many such plans").

"luxury" as opposed to "affordable" housing, and the constitutionality of this taking does not depend on the relative numbers of planned housing units priced at, above, or below market rate.

Plaintiffs also do not allege that the Project's non-quantifiable public benefits are false. For example, the new arena will be the home of a professional basketball team. Although Plaintiffs allege that the arena will generate less than $1 million in annual tax revenue (Am. Compl. ¶ 96), they do not allege that having a professional team in Brooklyn is not in itself a benefit to the public. Nor do they allege that the various uses planned for the Vanderbilt Rail Yard, a dormant part of the blighted ATURA area, will fail to benefit the public by their very effectuation, and not merely by their power to generate revenue.

### b. Asserted Purposes Are a "Mere Pretext" for an Actual Purpose to Bestow a Private Benefit

Although Plaintiffs do not allege facts sufficient to render plausible their claim that the Project serves no public use at all, they also claim that any benefits to the public are "secondary and incidental to the benefit that inures to FCRC" and that "Defendants' desire to confer a private benefit to FCRC was a substantial, motivating factor in Defendants' decision to seize Plaintiffs' property and transfer it to FCRC." (Am. Compl. ¶¶ 136-37.) This court must therefore consider whether Plaintiffs have sufficiently alleged that the purposes offered to justify the Project are "mere pretexts" and that the "actual purpose" of the Project is "to bestow a private benefit" on FCRC. Kelo, 545 U.S. at 478.

Although Kelo held that merely pretextual purposes do not satisfy the public use requirement, the Kelo majority did not define the term "mere pretext" or cite any case in which a taking was found to be unconstitutional on the ground that its purposes were merely pretextual.

Id.  The Second Circuit has not yet had the opportunity to articulate the standard according to which this court should measure whether an asserted use is merely pretextual.  In the absence of such guidance, this court will adopt Justice Kennedy's understanding of the term "mere pretext" as set forth in his concurrence in Kelo.

As discussed in greater detail *supra* at 52-54, Justice Kennedy derived a public-use rule from Equal Protection case law.  Justice Kennedy wrote:

> A court applying rational-basis review under the Public Use Clause should strike down a taking that, by a clear showing, is intended to favor a particular private party, with only incidental or pretextual public benefits, just as a court applying rational-basis review under the Equal Protection Clause must strike down a government classification that is clearly intended to injure a particular class of private parties, with only incidental or pretextual public justifications.

Kelo at 491.  Justice Kennedy therefore instructed that "[a] court confronted with a *plausible* accusation of impermissible favoritism to private parties should treat the objection as a serious one and review the record to see if it has merit, though with the presumption that the government's actions were reasonable and intended to serve a public purpose."  Id. (emphasis added).  This instruction is consistent with the rule that a plaintiff must allege "enough facts to state a claim to relief that is *plausible*" in order to survive a motion to dismiss for failure to state a claim.  Twombly, 127 S.Ct. at 1974 (emphasis added).

Plaintiffs have not set forth facts supporting a plausible claim of an unconstitutional taking.  Nowhere in the Amended Complaint or their briefs do Plaintiffs sufficiently allege any purpose to confer a private benefit.  In other words, Plaintiffs attempt to satisfy the "mere pretext" test solely by alleging that the purported purposes of the Project are dubious, but Kelo requires them to allege that the "actual purpose" of the Project is "to bestow a private benefit" on

FCRC.  Id. at 478.  In fact, Justice Kennedy, analogizing to Equal Protection jurisprudence,

would require "a clear showing [that a taking] is intended to favor a particular private party"

before the taking is ruled unconstitutional.  Id. at 491.  Plaintiffs do not allege any facts

suggesting that any Defendant had any reason to bestow a benefit on any private party.

Therefore, even if Plaintiffs could prove every allegation in the Amended Complaint, a

reasonable juror would not be able to conclude that the public purposes offered in support of the

Project are "mere pretexts" within the meaning of Kelo, i.e., mere pretexts for an actual purpose

to bestow a private benefit.

Plaintiffs of course allege that "[b]y taking plaintiffs' property and giving it to FCRC,

defendants intend to benefit FCRC" and that "Defendants' desire to confer a private benefit to

FCRC was a substantial, motivating factor, in defendants' decision to seize plaintiffs' property

and transfer it to FCRC."  (Am. Compl. ¶¶ 133, 137.)  Such a conclusory allegation is not

sufficient to withstand a motion to dismiss.  In Twombly, in which the Supreme Court

considered a claim of antitrust conspiracy, the Court explained that–

> [S]tating such a claim requires a complaint with enough factual matter (taken as
> true) to suggest that an agreement was made. Asking for plausible grounds to infer
> an agreement does not impose a probability requirement at the pleading stage; it
> simply calls for enough fact to raise a reasonable expectation that discovery will
> reveal evidence of illegal agreement.

127 S.Ct. at 1965.  The sole or primary fact alleged by the plaintiffs in Twombly was parallel

conduct by Incumbent Local Exchange Carriers (the "Baby Bells" created by the divestiture of

AT&T) in their dealings with Competitive Local Exchange Carriers.  Id. at 1962-63.  The

Supreme Court found that "[t]he inadequacy of showing parallel conduct or interdependence,

without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much

in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." Id. at 1964.

Although Twombly has not yet been applied in an eminent-domain case, I believe it is appropriate to do so. I note first that because Justice Kennedy, the fifth vote in the Kelo majority, would require a plaintiff challenging a taking to assert "a *plausible* accusation of impermissible favoritism to private parties," Kelo at 491 (Kennedy, J., concurring) (emphasis added), the plausibility standard recognized in Twombly arguably applied to eminent-domain cases even before Twombly was decided.

More importantly, however, the plausibility standard announced in Twombly was intended to apply beyond antitrust-conspiracy cases. Were this not so, then Twombly would not have addressed Conley v. Gibson, 355 U.S. 41 (1957), formerly the leading case regarding motions to dismiss for failure to state a claim, in the manner in which it did. Conley held that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. at 45-46. The Supreme Court could have used Twombly to announce a narrow exception to Conley for claims of antitrust conspiracy. Instead, however, the Court explained that Conley has been widely misunderstood and that a court applying a "focused and literal reading of Conley's 'no set of facts'" rule would improperly decline to dismiss "a wholly conclusory statement of claim." Twombly at 1968. This, the Court explained, was the mistake the Second Circuit made

when it reversed the district court's dismissal of Twombly's complaint.  Id. at 1968-69.  The

Supreme Court therefore announced that–

> [A]fter puzzling the profession for 50 years, this famous observation [*i.e.*, the "no
> set of facts" rule] has earned its retirement.  The phrase is best forgotten as an
> incomplete, negative gloss on an accepted pleading standard: once a claim has
> been stated adequately, it may be supported by showing any set of facts consistent
> with the allegations in the complaint.  Conley, then, described the breadth of
> opportunity to prove what an adequate complaint claims, not the minimum
> standard of adequate pleading to govern a complaint's survival.

Twombly at 1969 (citations and footnote omitted).  The generality of this discussion strongly

suggests that Twombly applies more broadly to all civil cases rather than only to claims of

antitrust conspiracy.

I note two additional grounds in further support of my obligation to apply Twombly in

this case.  First, the Twombly Court derived the plausibility rule at least in part from Fed. R. Civ.

P. 8, which applies to all federal civil litigation.  Twombly at 1966.  Second, Twombly also

relied on practical concerns, such as deterring the filing of frivolous cases and avoiding discovery

in such cases, id. at 1966-67, that are relevant to all areas of civil litigation (although I recognize

that those concerns may be more pronounced in antitrust-conspiracy cases than in most other

types of cases).

Under Twombly, Plaintiffs' claim that the public use requirement has been violated must

be dismissed.  As in Twombly, the facts alleged by Plaintiffs in the present case – the taking of

property from some private parties and the resulting benefit to other private parties – are as

consistent with lawful behavior as with unlawful behavior.  There is no doubt that the

Constitution permits property to be transferred from one private party to another if the transfer

serves a public use.  Berman, 348 U.S. at  33-34.  For that reason, Plaintiffs' allegations, which

include such a transfer but concede a variety of public uses, cannot constitute "plausible grounds to infer," Twombly at 1965, an "actual purpose [] to bestow a private benefit." Kelo, 545 U.S. at 478.[13]

* * *

Plaintiffs' allegations are not plausible grounds to infer that the asserted public uses of the Project are "palpably without reasonable foundation." Midkiff, 467 U.S. at 241. Because Plaintiffs concede that the Project will create large quantities of housing and office space, as well as a sports arena, in an area that is mostly blighted, Plaintiffs' allegations, if proven, would not permit a reasonable juror to conclude that the "sole purpose" of the Project is to confer a private benefit. Neither would those allegations permit a reasonable juror to conclude that the purposes offered in support of the Project are "mere pretexts" for an actual purpose to confer a private benefit on FCRC. For these reasons, Count One of the Amended Complaint, in which Plaintiffs assert a Section 1983 claim alleging a violation of the Taking Clause, is dismissed.

### D. Equal Protection and Due Process

Plaintiffs also claim that the taking of their property violates their equal protection and due process rights. (Am. Compl. ¶¶ 149-70.) These claims are based on the same facts as the Takings Clause claim.

---

[13] I have reviewed the Supreme Court's recent grant of *certiorari* in Erickson v. Pardus, No. 06-7317, 2007 WL 1582936 (U.S. June 4, 2007). Erickson does not alter this court's application of Twombly to the present case. In Erickson, the Supreme Court cited Twombly and suggested that Tenth Circuit erred in affirming the dismissal of a complaint as conclusory. However, the plaintiff in Erickson alleged facts that, if true, would give rise to liability. In contrast, the plaintiffs in Twombly and the present case alleged facts that are as consistent with lawful behavior as with unlawful behavior.

The Equal Protection Clause of the Fourteenth Amendment provides that no state may "deny to any person within its jurisdiction the equal protection of the laws." When, as in this case, "a statutory classification [] neither proceeds along suspect lines nor infringes fundamental constitutional rights," the classification "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993); see also Jankowski-Burczyk v. I.N.S., 291 F.3d 172, 178 (2d Cir. 2002). As already discussed, the takings at issue are rationally related to a legitimate governmental purpose. Those takings therefore do not offend the Equal Protection Clause.

The Due Process Clause of the Fourteenth Amendment provides that no state may "deprive any person of life, liberty, or property, without due process of law." Plaintiffs allege that Defendants deprived them of their property without due process of law by "providing an empty, meaningless process with a pre-determined outcome." (Am. Compl. ¶ 164.) The Second Circuit has rejected the notion that the process set forth in the EDPL is "empty" or "meaningless." In Brody v. Vill. of Port Chester, 434 F.3d 121 (2d Cir. 2005), the Second Circuit held that the procedures available under EDPL § 207, though "limited in scope," are "appropriate given the narrow role that the courts play in ensuring that [a] condemnation is for a public use." Id. at 134. The Second Circuit therefore held that those procedures satisfy the constitutional requirement of due process. Id. at 136. This court must therefore dismiss Plaintiffs' due process claim.

For these reasons, Counts Two and Three of the Amended Complaint, in which Plaintiffs assert Section 1983 claims alleging violations of the Equal Protection and Due Process Clauses of the Fourteenth Amendment, respectively, are dismissed.

### E.    EDPL § 207

Plaintiffs also assert a claim for judicial review under EDPL § 207.  (Am. Compl. ¶¶ 171-80.)  Having dismissed the claims over which this court has original jurisdiction, I decline to exercise supplemental jurisdiction over the Section 207 claim.  28 U.S.C. § 1367(c)(3).  The Section 207 claim, stated in Count Four of the Amended Complaint, is therefore dismissed without prejudice to its being re-filed in state court.  E&L Consulting, Ltd. v. Doman Indus. Ltd., 472 F.3d 23, 33 (2d Cir. 2006); Giordano v. City of New York, 274 F.3d 740, 754 (2d Cir. 2001).

## IV.    Conclusion

For the reasons set forth in this Memorandum and Order, Defendants' motion to dismiss is granted.  Pursuant to the Stipulation and Order dated March 8, 2007 (Docket No. 85), both the Goldstein case (06-CV-5827) and the Piller case (07-CV-152) are therefore dismissed.  Counts One, Two, and Three of the Amended Complaint are dismissed with prejudice.  Count Four of the Amended Complaint is dismissed without prejudice to its being re-filed in state court.


SO ORDERED.

Dated: June 6, 2007                                  /s/ Nicholas G. Garaufis
      Brooklyn, N.Y.                            NICHOLAS G. GARAUFIS
                                         United States District Judge